Charlemagne WHITFORD,
et al., Plaintiffs,

v.

FIRST NATIONWIDE BANK, Defendant.

Civ. A. No. C–91–0130–L(M).

United States District Court,
W.D. Kentucky,
at Louisville.

Aug. 27, 1992.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GAMBILL, United States Magistrate Judge.

This matter came before the Magistrate Judge for a fairness hearing on June 5, 1992 pursuant to the Court's Order of April 3, 1992 preliminarily approving the parties' proposed Stipulation of Compromise and Notice to the class and certifying the class for settlement purposes. The following opinion comprises the Magistrate Judge's Findings of Fact, Conclusions of Law and Recommendations to the Court.

BACKGROUND

1. On February 28, 1991, the named plaintiffs, holders of a first residential adjustable rate mortgage (ARM), filed this action, against the defendant, First Nationwide Bank (Nationwide) alleging breach of con-

tract and violation of the Truth in Lending Act, Title 15 U.S.C. Sections 1601, *et seq.* and Kentucky law governing residential mortgage lending. Plaintiffs complained, on their behalf and on behalf of all others similarly situated, that they had been charged a higher rate of interest on their ARM loan than that permissible under the terms of their loan or the Truth in Lending Act.

2. Nationwide answered the complaint denying the allegations and reserving the right to assert additional defenses and counterclaims.

3. The parties engaged in extensive discovery and notified the Court on September 24, 1991 that a settlement was being negotiated.

4. On March 24, 1992, counsel met to finalize a settlement agreement. On the same date a conference was held with Chief Judge Ronald E. Meredith, in chambers, and counsel submitted a proposed Notice and "Stipulation of Compromise" outlining the terms of the settlement.

5. On March 31, 1992, a telephonic conference was held before Judge Meredith.

6. A final Stipulation of Compromise was filed with the Court on April 2, 1992.

## REQUIREMENTS FOR CLASS ACTION SETTLEMENT

7. Court approval is required in order to settle a class action. Fed.R.Civ.P. 23(e). Rule 23(e) provides:

> Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

8. There are three steps to be taken by the Court: 1) the Court must preliminarily approve the proposed settlement; 2) members of the class must be given notice of the proposed settlement; and 3) a hearing must be held, after which the Court must decide whether the proposed settlement is fair, reasonable and adequate. *Williams v. Vukovich,* 720 F.2d 909 (6th Cir.1983); *Stotts v. Memphis Fire Department,* 679 F.2d 541 (6th Cir.1982), *reversed on other grounds, sub nom. Firefighters Local Union No. 1784*

*v. Stotts, et al.,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Bronson v. Board of Education of the City School District of the City of Cincinnati,* 604 F.Supp. 68 (S.D.Ohio 1984).

## THE STIPULATION OF COMPROMISE AND NOTICE

9. The Stipulation of Compromise provides, in pertinent part:

a. The Class consists of persons who do not file exclusion requests and who executed a promissory note and first mortgage securing a residential ARM either (1) being actively serviced by First Nationwide Bank as a residential first mortgage ARM loan as of the opening of the defendant's business day on April 1, 1991 or (2) serviced by the defendant as a residential first mortgage ARM loan which was foreclosed, converted to fixed, assumed or paid off prior to the opening of the defendant's business day on April 1, 1991 and for which loan data and payment history information are electronically available on the defendant's servicing system.

b. Plaintiffs' counsel will retain experts to investigate methods of reallocation developed by Price–Waterhouse, the defendant's expert.

c. Defendant will: 1) pay refunds to make class members whole; 2) pay for the costs of notice to the class; 3) pay additional compensation for continued disputes involving the amount of refunds to class members whose loans were made by lending institutions subsequently acquired by the defendant; 4) pay additional compensation for continued disputes involving the amount of refunds to class members whose loans were adjusted based on the lookback date to the *Wall Street Journal;* and 5) use the Price Waterhouse reallocation procedures to assure, with a 95 percent degree of "certainty," that systemic errors will be corrected and, with a 95 percent degree of "confidence," that no more than 7 percent of Open Loans will have remaining idiosyncratic errors.

d. Upon final judgment, plaintiffs will accept the settlement in "full, complete and final compromise and settlement of any and all claims in favor of the [class members]

arising out of, based upon, in connection with or relating in any way" to any claim against the defendant or its acquired institutions regarding principal and interest rate adjustments on residential ARM loans, and any damage as a result of any of the foregoing to any class members.

e.  Nationwide will issue refunds no later than sixty days from the date of final judgment approving the settlement or December 31, 1992, unless such refund check is undeliverable or not cashed.

f.  Each class member receiving a refund with respect to an acquisition loan will receive an additional amount equal to twenty percent (20%) of the refund no later than either the date of final judgment approving the settlement or December 31, 1992.

g.  Nationwide will pay a penalty of $175,000 to satisfy claims that reference to the *Wall Street Journal* for lookback dates for loan adjustments was incorrect, but the penalty is not to constitute part of the common fund.

h.  The named plaintiffs will receive a one time payment of $5,000.

i.  Class counsel will apply to the Court for an award of reasonable attorneys' fees and costs.

j.  Reallocation procedures:

1.  The defendant, under the supervision of Price Waterhouse, has started to: a) review and verify open loan data (using forty-eight agreed-upon variables), payment history data and index data and correct errors; b) review and verify closed loan index data; c) create a schedule indicating the amount of interest a class member would have paid on the loan under the reallocation procedures and compare the schedule with the interest actually paid by the class member.

2.  In the event of an overcharge on a closed loan, sums due to the defendant as a result of a foreclosure action or skip trace search will be deducted from the refund amount.

3.  Class members will not be liable for undercharges.

4.  Open loans will be reallocated from the date Nationwide began servicing them through the last principal and interest payment prior to reallocation with certain exceptions.

5.  Interest on overcharges during the active life of the loan will be included in the refund.

10.  Notice Procedure

a.  Class counsel opened a post office box in the name of "First Nationwide ARM Litigation" in the care of the Clerk of the Court to facilitate delivery of communications pertaining to the class action.

b.  Nationwide mailed, on or before April 24, 1992, to each potential member of the class a notice of the pending class action and proposed settlement.

c.  The Notice included a brief history of the litigation, explained exclusion procedures and included an exclusion request, explained rights and obligations of class members, summarized the terms of the proposed settlement and informed class members of the fairness hearing.  An address and telephone number was listed for potential class members for purposes of receiving and responding to inquiries and potential class members were informed of the date on which the fairness hearing would be held and the date by which to file objections.

11.  On April 3, 1992, the Court preliminary approved the Stipulation of Compromise and Notice.  The Court's Order required, in addition to mailing a Notice to each potential member of the class, publication of a summary Notice on April 23, 1992 in the national edition of *USA Today* and in 19 regional newspapers in which the defendant had advertised its services and in the Sunday edition of the *San Francisco Examiner/Chronicle* on April 26, 1992.

PRELIMINARY APPROVAL

■■■ 12.  Preliminary approval of a proposed settlement is based upon the court's familiarity with the issues and evidence, as well as the arms-length nature of the negotiations prior to the proposed settlement, ensuring that the proposed settlement is not illegal or collusive.  *Bronson*, 604 F.Supp. at 71; *Stotts*, 679 F.2d at 551.  Once the court has given preliminary approval, an agree-

ment is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable. *Bronson,* 604 F.Supp. at 71; *Stotts,* 679 F.2d at 551.

13. During the telephonic conference before Judge Meredith:

a. Defendant's counsel stated that Price Waterhouse had developed certain procedures for testing Nationwide's ARM Loan Portfolio and defendant had refunded $3,330,000.00 to 64,000 holders of first residential ARMs as of March 1, 1992.[1]

b. It was stated that based on the refunds, the settlement fund was estimated to be $5,000,000.00, excluding the refunded amount of $3,300,000.00.

c. Plaintiff's counsel stated that, once a fairness hearing date was set, and a cut-off date for objections established, counsel would consent to "have the court consider all objections that are on file before the hearing...." even if filed untimely.

14. On April 3, 1992, Judge Meredith preliminarily approved the proposed Stipulation of Compromise and Notice and conditionally certified the case as a class action, designating the named plaintiffs as class representatives and counsel as class counsel. The Court based its preliminary approval on its familiarity with the evidence and issues presented in this case and the character of the negotiations. The Court concluded that the proposed Stipulation of Compromise was neither illegal nor collusive, and that it was the product of serious, informed arms-length negotiations and that it fell within the range of possible approval. *Vukovich, supra.*

15. Judge Meredith's Order provided that in the event the settlement was found to be unfair, the class would dissolve and the defendant could challenge the class *de novo.*

■ 16. The Court also preliminarily approved the proposed form of Notice. The Notice was subsequently published and mailed as directed. Notice to members of the class, both of the proposed settlement and the hearing to determine whether the settlement was fair, adequate and reasonable, is required. *Bronson,* 604 F.Supp. at

71; *Vukovich,* 720 F.2d at 921; *Stotts,* 679 F.2d at 551.

17. Potential class members had over four weeks to consider the proposed settlement, to consult class counsel or their own counsel and to prepare an objection or fill out an exclusion request.

18. The parties have fully complied with the terms of the Court's Order of April 3, 1992.

■ 19. Because the names and last known addresses of all class members were available from the defendant's business records, the mailing of the notice of the proposed settlement agreement and the fairness hearing was the best notice practical under the circumstances. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Publication in regional and national papers added to the reliability of the notice. The notice was sufficient to allow members of the class, "a full and fair opportunity to consider the proposed decree and develop a response." *Vukovich,* 720 F.2d at 921.

20. The Notice properly identified class members and the scope of the class.

21. The Notice provided sufficient information which would appropriately inform class members of their rights.

THE FAIRNESS, REASONABLENESS AND ADEQUACY OF THE PROPOSED SETTLEMENT

■ 22. On June 5, 1992, the Magistrate Judge held a hearing in order that the parties and class members could comment on the proposed settlement agreement. Based on the statements from the parties' counsel and the objectors, one of whom is an attorney, the evidence, and the Magistrate Judge's familiarity with this matter, the Magistrate Judge finds that the proposed settlement agreement is fair, reasonable and adequate and that the best notice practical under the circumstances has been given to all individuals who may be affected by the settlement. *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). See

---

1. The reallocation procedures are set forth in Exhibit A to the Stipulation of Compromise.

also, *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1979) (Judicial evaluation involves a limited inquiry into whether the possible rewards of litigation with its risks and costs are outweighed by the benefits of settlement.)

■ 23. The law generally favors and encourages the settlement of class actions. *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir.1981), *vacated on other grounds and modified*, 670 F.2d 71 (1982).

■ 24. In assessing the fairness, reasonableness, and adequacy of a settlement agreement, the Court must consider various factors. *Bronson*, 604 F.Supp. at 73; *Manual for Complex Litigation Second*, § 30.41; *3 B. Moore, Federal Practice*, § 23.80[4] at p. 23–488.

25. The factors to be assessed may include: the complexity, expense and likely duration of the litigation; the reaction of the class to the settlement; the stage of the proceedings and the amount of discovery completed; the risks of establishing liability; the risks of establishing damages; the likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; the judgment of experienced trial counsel and the public interest. *Grinnell Corp.*, at 448; *Bronson*, 604 F.Supp. at 73; *Vukovich*, 720 F.2d at 922; *Stotts*, 679 F.2d at 552.

26. A class action settlement cannot be measured precisely against any particular set of factors. The Court may be guided by factors, "the relevancy of which will vary from case to case." *Ohio Public Interest Campaign v. Fisher Foods*, 546 F.Supp. 1, 6–7 (N.D.Ohio 1982). *Accord, Thompson v. Midwest Foundation Indep. Physicians Assoc.*, 124 F.R.D. 154 (S.D.Ohio W.D.1988).

## LIKELIHOOD OF ULTIMATE SUCCESS ON THE MERITS BALANCED AGAINST THE RELIEF OFFERED BY THE PROPOSED SETTLEMENT AGREEMENT.

27. The relief offered to class members includes: a) reallocation of loans according to the data appearing in each borrower's loan documents even though recovery of interest overcharges may be barred by applicable statutes of limitations in many cases and b) virtual elimination of systemic and idiosyncratic errors in calculating interest on loans.

28. Given the risk that less monies would be refunded to the class if Nationwide counterclaimed for undercharges or other debt incurred as a result of, for example, foreclosure, the relief provided by the Stipulation of Compromise is fair, reasonable and adequate.

29. The benefit to the class balanced against the risks of continued litigation indicates that the amount and form of the offered relief is fair, adequate and reasonable.

## THE COMPLEXITY, EXPENSE AND LIKELY DURATION OF THE LITIGATION

30. This action was brought pursuant to state law as well as the federal Truth in Lending Act and it has been pending for more than a year.

31. In the absence of the proposed settlement, pretrial proceedings and trial of the issues would require substantial additional time and would delay relief for class members. Without the proposed settlement, defendant indicates that it would assert counterclaims against plaintiffs who had been undercharged. At the time of the fairness hearing, an aggregate of 65,617 loans had been reallocated; of these, 63,817 had been reallocated electronically and 1,800 had been reallocated manually; the defendant had paid out $4,154,112.69 in refunds for overcharges to 12,523 borrowers and had discovered undercharges in the amount of $12,788,315.88 for 23,441 loans. Litigation would result in increased costs for all parties.

32. It would be a complex matter for the District Court to exercise pendent jurisdiction over the state claims in this action. State law varies and potential class members number approximately 129,000 from several different states.

33. Issues that would lengthen the litigation process include:

a. the defendant's right to offset interest refunds by interest overcharges.

b. whether the defendant is liable for servicing errors committed by acquired institutions prior to the date of acquisition.

c. challenge to certification on the basis of loan type and promissory note form.

d. counterclaims against individual borrowers.

e. questions of damages in light of varying state law.

## THE NEGOTIATION PROCESS AND OPINION OF COUNSEL

34. Extensive discovery was conducted by the parties prior to trial and the parties have continued to exchange information during the negotiation process. The proposed settlement was not a hurried agreement, but was reached after at least six months of arms length negotiation.

35. Plaintiffs' counsel is experienced in class action matters and has been assisted by independent experts in evaluating the settlement procedures. The opinion of plaintiffs' counsel that the proposed settlement agreement is fair, adequate and reasonable is an important factor in the Court's consideration. The proposed settlement agreement suggests no bias, collusion, or coercion in favor of any party or subgroup of class members.

36. Plaintiffs' counsel have negotiated on behalf of the class: a) the fairness and adequacy of the reallocation procedures; b) the formula defendant will use to calculate interest rates under various note forms; c) defendant's method to determine values for each of the more than 50 different indices used to arrive at interest rates; d) the actual values for the indices used in the reallocation procedure.

## REACTION OF THE CLASS TO THE SETTLEMENT

37. The proposed settlement affects only those borrowers who have a first mortgage securing a residential ARM loan.

38. In response to the Notice, approximately 1,950 potential class members contacted class counsel by telephone and 300 potential class members contacted class counsel by mail with inquiries. Class counsel responded in writing to approximately 384 potential class members.

39. Although approximately 129,000 Notices were mailed directly to potential class members, 602 potential class members filed exclusion requests before the date of the hearing and only three objections were received by the Court and by counsel for the plaintiff class.

40. The small number of objectors is a good indication of the fairness of the settlement. *Laskey v. International Union*, 638 F.2d 954 (6th Cir.1981); *In re Beef Industry Antitrust Litigation*, 607 F.2d 167, 180 (5th Cir.1979), cert. denied 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); *Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir.1978).

41. A Court should not withhold approval merely because some class members object to it. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *Bronson*, 604 F.Supp. at 73.

42. In considering the extent of opposition, the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis. *Armstrong v. Board of School Directors*, 616 F.2d 305, 315 (7th Cir.1980); *Bronson*, 604 F.Supp. at 78.

43. In response to the notice of settlement, the attorney for one class member filed a written objection which was withdrawn before the hearing with a reservation of right to object to any award of attorneys fees. Another class member, Mr. Neil F. Garfield, appeared at the hearing to object on behalf of himself and his wife, Ann. Mr. Garfield is an attorney at law in the State of Florida and also sought to represent John and Kathy Pecaro as objectors in the fairness hearing. However, the Pecaros do not appear to hold a first residential mortgage and therefore are not class members entitled to raise an objection. On the day before the fairness hearing, Mr. Garfield filed in the Florida Courts a class action suit alleging primarily the same facts at issue in the suit *sub judice*, with the exception that all holders of ARM mortgages with Nationwide, not just those with first residential ARM's, would be potential class members. The Pecaros and the Garfields

seek to be the representative plaintiffs in the Florida suit.

44. Mr. Garfield objected to certification of the class for settlement purposes.

■ 45. An action may be certified as a class action for settlement purposes if:

a. the settlement class is so numerous that joinder of all members is impracticable.

b. there are questions of law or fact common to the settlement class.

c. the claims or defenses of the representative parties are typical of the claims or defenses of the settlement class.

d. the representative parties will fairly and adequately protect the interest of the settlement class.

e. the Court finds that questions of law and fact common to the members of the settlement class predominate over questions affecting only individual members and that a settlement class is superior to other available methods for a fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23.

46. The class consists of approximately 129,000 borrowers. The question common to the class is whether interest rate adjustments to class members first residential ARM loans were calculated in accordance with the members' loan documents. The Whitford's claims are typical of the claims of the class. The Whitfords will fairly and adequately protect the interests of the settlement class. Class counsel is experienced in handling class actions. The common question of whether members' interest rates were properly calculated predominates over questions affecting individual members. A class action settlement is more efficient than individual settlement or litigation of individual actions because it assures a prompt, fair and adequate remedy for class members.

47. Mr. Garfield contended that the District Court erred in preliminarily approving a settlement that bars class members from pursuing other claims against the defendant.

■ 48. A settlement may properly prevent class members from subsequently asserting claims relying upon a legal theory different from that relied upon in the class action complaint, but depending upon the very same set of facts. *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 221 (5th Cir.1981), cert. denied, *sub nom., C.F.S. Continental Inc. v. Adams Extract Co.,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982), cert. also denied *sub nom., Three J. Farms, Inc. v. Adams Extract Co.,* 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). It is common for a class action settlement agreement to contain a release of "any and all related civil claims the plaintiffs had against the settling defendant[ ] based on the same facts." *In re Baldwin–United Corp.,* 770 F.2d 328, 337 (2nd Cir.1985). *Accord, TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 461 (2d Cir.1982).

■ 49. The scope of the releases contained in the settlement is fair, reasonable and adequate and it is disclosed sufficiently in the Notice to the class. The releases extend to any and all claims for any and all types of damages or for equitable relief related to principal and interest adjustments and interest rate adjustments which are the subject of this action.

50. Mr. Garfield contended that the relief to the class members under the terms of the settlement agreement is inadequate, because if the acts of the defendant were proved to be intentional, as alleged in the recent lawsuit filed by Mr. Garfield in the Florida Courts, the potential recovery would be much greater.

51. "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell Corp.,* at 455. There is no evidence in the record and plaintiffs' counsel has stated to the Court that no evidence exists in the discovery materials to indicate that the defendant intentionally or fraudulently overcharged class members.

52. Mr. Garfield received a refund from Nationwide in February, 1992. He requested and received from the defendant a schedule showing the amount of interest charged over the life of his loan. Mr. Garfield alleges that he consulted experts who stated that certain overcharges reflected "skimming" by Nation-

wide. Mr. Garfield offered no evidence like expert testimony or an affidavit of an expert to support his position.

53. Mr. Garfield contended that class members may have been forced into bankruptcy because of overcharges and therefore the relief offered to those class members is inadequate. However, there is no evidence in the record that any class member defaulted on monthly mortgage payments as a result of interest overcharges. The average refund to class members is $331.00, reflecting an interest overcharge extending over several years. Any class member who believed that such a claim was viable was given a reasonable opportunity to opt out of the class.

54. The deduction of a deficiency amount of up to $3,000, from a refund payable to a class member who held a closed loan which was foreclosed upon and for whom the foreclosure resulted in a deficiency judgment, is fair and reasonable as such sum represents the average administrative cost of foreclosure.

55. The deduction of $30.00 from the refund due any class member for whom the defendant was compelled to utilize a "skip-trace" is fair and reasonable as it reflects the cost of a skip-trace.

56. Mr. Garfield left the hearing before it was over and expressly waived his right to question or cross-examine witnesses.

57. A Court must balance the amount offered in settlement against the strength of the class action suit. *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2d Cir.), cert. denied sub nom. *Cotler Drugs, Inc. v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). We do not have the right nor the duty to reach ultimate conclusions on the merits of the dispute. *Grinnell Corp.* at 456.

THE PUBLIC INTEREST

58. There is an overriding public interest in favor of settlement of class action lawsuits. *Armstrong* at 313. A Court, in satisfying itself that the settlement is fair, reasonable and adequate serves as the guardian of the interest of the absent members of the class. *Liebman v. J.W. Peterson Coal & Oil Co.*, 73 F.R.D. 531, 534 (N.D.Ill. 1973).

59. The objective of the settlement is to make borrowers whole for past servicing errors and to correct those errors so that they do not affect future servicing.

60. Reformation of interest allocation procedures will simplify such procedures and virtually eliminate potential errors in future loans. The reallocation procedures affect favorably those class members and future borrowers who hold or will hold a variety of types of either open or closed loans with the defendant bank.

61. Class counsel have agreed to allow the Court to decide fair and reasonable compensation for their representation of the class.

RECOMMENDATIONS

The Magistrate Judge having made findings of fact and conclusions of law, recommends:

62. Notice, class certification and approval of the Settlement meet the requirements of due process;

63. The Settlement is fair, adequate and reasonable and should be implemented in accordance with the terms of the Stipulation and Compromise;

64. The objector has not demonstrated that Notice was inadequate or that the Settlement is collusive, unfair, inadequate or unreasonable in any respect;

65. Class certification is appropriate;

66. Plaintiffs' claims should be dismissed with prejudice;

67. Judgment should be entered in accordance with the terms of the Settlement.